Filed 1/28/15  P. v. Turner CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# **COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C069089 |
| Plaintiff and Respondent, | (Super. Ct. No. SF114626A) |
| v. | |
| ROBERT ALEXIS TURNER, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C069380 |
| Plaintiff and Respondent, | (Super. Ct. No. SF114626C) |
| v. | |
| VALERIE NESSLER, | |
| Defendant and Appellant. | |

1

Defendants Robert Alexis Turner and Valerie Nessler were jointly tried before separate juries for killing a victim who died after being stabbed numerous times, shot with a shotgun, and set on fire. Turner was convicted of (1) first degree murder with special circumstances of arson and torture (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(H) and (a)(18)) and personal discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and (2) a separate count of arson causing great bodily injury (§ 451, subd. (a)). (Unless otherwise stated, statutory references that follow are to the Penal Code.) Nessler was convicted of (1) first degree murder, with personal use of a knife (§ 12022, subd. (b)(2)), and (2) arson.

We ordered defendants' appeals consolidated.

Turner contends (1) the trial court erred in failing to instruct on the need for corroboration of an accomplice as to the special circumstances of arson and torture; (2) there was insufficient corroborating evidence as to the arson count and the murder special circumstances of arson and torture; (3) he was improperly denied a jury trial on a restitution fine (§ 1202.4); and (4) the court erred in imposing and suspending a parole revocation fine (§ 1202.45) where the sentence gave no possibility of parole. We order the section 1202.45 fine stricken but otherwise affirm the judgment against Turner.

Nessler contends the trial court erred in allowing into evidence a note Turner sent to her through a third party while she was in custody. We affirm the judgment against Nessler.

FACTS AND PROCEEDINGS

The following evidence was presented to both juries, unless otherwise stated.

Nessler shared a Stockton residence with the victim, Jeffrey Wheatley, and witness Drew Pyeatt. They all used drugs, and the victim sold methamphetamine from the house. Turner was Nessler's friend and sometimes joined the residents with his friend, Allen "AJ" Periman (whose trial was severed and whose second-degree-murder

2

conviction we affirmed in a separate appeal (*People v. Periman* (Aug. 13, 2014, C071812) [nonpub. opn.]).  Turner had been in the garage, where Pyeatt kept gasoline.

In March 2010, the victim bragged to Nessler about having killed someone in 1994.  Nessler told Turner, who probed for details and said it sounded like the circumstances surrounding the death of his own brother, William "Moose" Phillips, who had been shot in 1994.  Pyeatt testified he "heard the talk around the house" about it.

On the afternoon of April 6, 2010, Nessler warned Pyeatt it was not safe for him to be in the house.  Turner phoned and told Pyeatt things were going to happen, and if Pyeatt said anything, he and his parents would be killed.  Pyeatt warned the victim, who thought he could talk his way out of the potential danger.  Pyeatt left.  Nessler suggested she was going to leave the house also but instead stayed behind.

Pyeatt returned home around 11:30 p.m., saw flames, and called 911.  The fire was to an area around a corpse in the entryway, later identified as Wheatley.

The city's fire investigator was of the opinion the fire was intentionally set.

On April 6, 2010 at about 11:15 p.m., Officer Nick Sareeram of the Lodi Police Department stopped a black Honda Accord in Lodi.  He turned on his spotlight and he then saw a person riding in the front passenger seat get out of the car and run away.  He could only describe him as a male wearing a white shirt and khaki pants.  Officer Sareeram went to the Honda and found that Allen Periman was driving the car and Valerie Nessler was seated in the middle of the rear seat.  When Officer Sareeram searched the area of the right front passenger seat he found a glass smoking pipe.

The medical examiner who performed the autopsy of Wheatley testified the victim suffered shotgun wounds to his head, face, and trunk; blunt force trauma to his head, face, and trunk; more than 30 stab wounds to his head, face, neck, and trunk; and thermal burns to 100 percent of his body.  Each form of trauma included injury of lethal capacity, but none of the injuries were instantaneously fatal.  The medical examiner believed the victim was shot first, began bleeding, then sustained the blunt force trauma and stab

3

wounds at about the same time, and then was set on fire. The victim was still alive when he was set on fire. The medical examiner opined the victim suffered mentally and physically "the highest levels of pain a human being could experience."

A criminalist testified the blood trail showed the attack started in the home's utility room; the victim then moved through the kitchen to the entryway, where he fell. Different blood drop patterns in other rooms suggested a different person had cut themselves and walked through the house. Police found a plastic bag in the entryway, containing two bent bloody knives, clothes, and other items. DNA testing of the blood on the blades was consistent with the victim's profile, and blood on one handle was consistent with Turner's profile. Blood samples from the hallway and the wall near the garage door were consistent with Turner's DNA profile. DNA testing on a pair of latex gloves found in a bedroom excluded Turner, but a swab from inside one glove was consistent with Nessler's DNA, and a bloodstain on the other glove was consistent with the victim's DNA.

Only Nessler's jury heard evidence of statements she made when questioned by the police. She initially denied knowing anything about the crimes but then, in a third interview, admitted she was involved but said she participated out of fear that Turner and Periman would kill her if she did not.

Turner turned himself in on April 17, 2010. The tip of his right middle finger was cut but healing. It was consistent with being about two weeks old and with stabbing a hard surface with a knife, causing the hand to slide down the blade.

Only Turner's jury heard evidence of a recorded jailhouse conversation between Turner and friend Trisha Rivera. Defendant said, "I didn't kill him. I didn't. I shot him, but I didn't kill him. I, I mean, that's just being real. I didn't. He was still alive when that bitch set him on fire." Turner said it would be his word against hers. Turner also said, with apparent reference to his cut finger, "It's healed now, see it? I can't feel it. Dead. . . . Super-glued it back on. . . . [I]t was just hanging like this. Like, this, my nail

4

could touch this. . . . It got caught on fire. . . . [I]t fuckin' came back and caught the whole thing on fire, stuck to my hand." He said he told the "psych," "you ever had fuckin' brain matter all over your face? Have you ever tasted someone else's brains?" Turner also said the police knew his body bore the victim's DNA because it showed up on tests, even though Turner had bleached everything.

Nessler's friend, Gregg Way, testified in front of Turner's jury only. He visited Nessler in jail. He did not know Turner. Nessler told Way that Turner wanted Way to visit and put money on Turner's "books" in jail. Way did not visit Turner but put $110 on his books. Way never discussed putting $5,000 on Turner's books.

A corrections officer testified before both juries that she overheard a conversation between Turner and Nessler in holding cells waiting to go to the courtroom. Turner asked if Nessler had read "it." She said, "I haven't even read it yet." Defendant said, "You need to read it. You need to read it to him over the phone. And then you need to destroy it because it's hot." A deputy heard the exchange and asked Nessler to turn "it" over. Nessler said she did not have it, she left it on the bus. The officer threatened to tell the judge. Nessler smirked, put her hand down her pants, and produced a handwritten note ("kite"). As the female corrections officer walked away, she heard Turner say "fucking bitch" but did not know if he meant her or Nessler.

The note, which was read only to Turner's jury, not Nessler's jury, said:

"Gregg, I wish we could have met on different terms, but it is what it is. Thank you for what you've done for me so far. Let me get to the point of this. I'm going to need you to take care of me, Gregg, if I'm going to get on the stand and take this whole beef. I love Val. She's my little sis. But by taking this, my chance of an appeal is gone. Can you understand that? You are not obligated to take me up on this. I am only suggesting that if I'm going to willingly spend the rest of my life in prison, and get Val off, I need to know I'm going to be taken care of. I'm a man of my word, Bro, always have been. Look, Gregg, I'm going to need a gesture to know we on [sic] the same page.

5

I'm not asking you to break yourself. That is not what I'm saying. I'm only saying that I am not going to walk into this life sentence with nothing to show for it. I do understand -- I do understand you do feel likewise, but this is my life we're talking about. Put enough on my books to get me through Tracy. I will then give you my mom's info so we can stay in touch. Five grand will get me through the next few years. I'll take the stand and do everything to get Val home. The five is to start my journey. Now that I've laid it out to you, the next move is yours. My word is my bond. I know you do not know me, but my word is bond. This ain't personal. It's business. I love you for loving Val. Thank you for what you did for Chloe [deceased daughter of Nessler]."

Turner did not testify at trial.

Nessler testified in front of both juries. She testified she warned the victim to get out of the house. Before she could leave, Turner kicked in the front door, carrying a shotgun, followed by Periman, who told her not to leave. She was scared. She heard two gunshots and the sounds of a struggle coming from the kitchen. Periman told Turner that Nessler would "snitch." Turner grabbed a knife from the kitchen, stabbed the victim multiple times, then gave the knife to Nessler and told her to stab the victim. She was afraid. She took the knife and pretended to stab the victim. She denied wearing gloves. Turner ran to the garage, returned with a gasoline can, poured gasoline on the victim, and then hit the victim on the head with the gas can and with what appeared to be the butt of the shotgun. Turner told Nessler to get a match and set fire to the victim. She refused. At Turner's command, she grabbed the garbage bag for his clothes, and two lighters fell out when she dumped the garbage from the bag. Turner lit the victim on fire. Nessler tried to run, but Turner forced her into a car, and Periman drove them away. She did not alert the police officer who stopped the car because she was afraid. During transport from jail to the courthouse for trial, someone other than Turner passed her a note, but she did not get a chance to read it before it was confiscated. She planned to give it to her lawyer. She denied that she was cooperating with Turner.

6

After the juries returned guilty verdicts, the trial court sentenced Turner to life without possibility of parole for the first degree murder with special circumstances of arson and torture. The court added a consecutive term of 25 years to life for the gun enhancement. Pursuant to section 654, the court stayed imposition of sentence on the arson conviction. The trial court sentenced Nessler to a term of 25 years to life for first degree murder, plus a consecutive one year for use of the deadly weapon. The court stayed imposition of sentence on the arson conviction.

DISCUSSION

I

*Turner's Appeal*

A. *Instruction on Corroboration of Accomplice for Special Circumstances*

Defendant complains the trial court prejudicially erred in failing to instruct the jury sua sponte with CALCRIM No. 707, regarding the need for corroboration of accomplice Nessler's testimony as to the special circumstances of arson and torture. We conclude the error was harmless.

Section 1111 provides in part, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ."

The trial court has a duty sua sponte to instruct on the need for corroboration if accomplice testimony is used to prove a special circumstance based on a crime other than the murder charged in the case. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1177, cited in Bench Notes to CALCRIM No. 707 (2014) p. 431.)

Arson and torture are both separate crimes. (§§ 451, 206.) Accordingly, the trial court erred in omitting CALCRIM No. 707.

As noted by the People, the California Supreme Court addressed the prejudice analysis in *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303-304 (*Gonzales*): " 'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Id*. at p. 303.) The defendant in *Gonzales* argued that failure to instruct on corroboration should require the full harmless error analysis for state law error according to *People v. Watson* (1956) 46 Cal.2d 818, 836 -- requiring reversal if, after examination of the entire case, it is reasonably probable defendant would have obtained a more favorable result but for the error. The *Gonzales* court rejected the argument, stating the analysis of harmless error in the omission of accomplice instructions "reflects the idea that sufficient corroboration allays the concerns regarding unreliability embodied in section 1111. Thus, even in cases where the full complement of accomplice instructions . . . was erroneously omitted, we have found that sufficient corroborating evidence of the accomplice testimony rendered the omission harmless. [Citations.] . . . [T]he evidence of corroboration is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.] Furthermore, we have held that 'even if there were insufficient corroboration, reversal is not required unless it is reasonably probable a result more favorable to the defendant would have been reached.' [Citation.] In other words, *in the absence of sufficient corroboration* we will submit the omission of accomplice instructions to the harmless error analysis for state law error under [*Watson*]. [¶] To be sure, we have occasionally engaged in both an analysis . . . under [*Watson*] when the full complement of accomplice instructions has been omitted. [Citations.] . . . [However,] the *Watson* analysis . . . [is] an alternative harmless error analysis, based on

8

an assumed alternative argument that the corroboration of the accomplice testimony was insufficient. . . ." (*Gonzales, supra*, 52 Cal.4th at pp. 303-304.)

Turner's reply brief does not address *Gonzales* but implies it is merely a different line of precedent than California Supreme Court cases applying the *Watson* standard. We disagree, but, in any event, defendant's contention fails under either standard.

Though the trial court did not instruct with CALCRIM No. 707, the court *did* instruct Turner's jury with CALCRIM No. 334 on the need for corroboration of accomplice testimony as to crimes charged: "If you decide that Valerie Nessler was an accomplice, then you may not convict the defendant of the crimes charged based on her testimony alone. You may use the testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. . . . [¶] Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

Turner cannot possibly have been prejudiced by omission of a specific instruction on corroboration for the arson special circumstance, because (1) the trial court instructed on the need for corroboration for the charged crimes; (2) arson was a charged crime separate from the murder count; and (3) the jury found Turner guilty on the separate count of arson. The arson special circumstance suffices for the first degree murder conviction.

As to the torture special circumstance, there was more than enough corroborating evidence. During the jail visit Turner admitted shooting the victim. Turner's blood was on the handle of a knife that had the victim's blood on the blade. Turner had a cut finger

9

consistent with having hurt himself while using the knife. Turner's blood was on the wall next to the door to the garage where the gasoline can had been stored. The victim suffered excruciating mental and physical pain before he died.

Thus we find both that there was sufficient corroboration of Nessler's testimony as to the special circumstance allegation and that, if there was not, it is not reasonably probable that defendant would have obtained a more favorable result if the court had instructed the jury as set forth in CALCRIM No. 707.

Under a separate heading, Turner argues that permitting a jury to convict based on uncorroborated accomplice testimony violates not only state law, but also federal due process, triggering the question whether error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. Here, however, the jury did not convict based on uncorroborated accomplice testimony.

We conclude omission of CALCRIM No. 707 was harmless error.

### B. Sufficiency of Corroborating Evidence

Turner argues there was insufficient independent evidence to corroborate Nessler as to the arson count, as well as the arson and torture special circumstances.

"[E]vidence of corroboration is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Gonzales, supra*, 52 Cal.4th at p. 304.) "To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] ' "[T]he corroborative evidence may be slight and entitled to little consideration when standing alone." [Citation.]' " (*People v. Avila* (2006) 38 Cal.4th 491, 562-563 (*Avila*).)

10

Turner's appellate brief acknowledges the independent evidence "amply corroborated Ms. Nessler's testimony as to Mr. Turner's involvement in a murder." His argument is that, without Nessler's testimony, the jury knew nothing about Turner's alleged motive to hurt the victim but instead knew only that Turner shot the victim, Turner had a healing cut on his finger, and he left blood on a knife and in the house. Turner's reply brief says the only item corroborated is that he stabbed the victim. Turner also maintains there is no independent evidence that he was the one who flicked the lighter and held it to the gasoline. Turner says the jury was not presented with a "natural and probable consequence[]" theory to hold Turner responsible for arson and torture committed by Nessler. Turner suggests the prosecutor relied on the act of setting fire as the "core" of the torture special circumstance, and there is insufficient corroborating evidence that he lit the fire.

As to who lit the fire, Turner told Rivera at the jailhouse that the fire caused something to stick to his hand. This indicated his proximity to the fire, which an expert testified did not spread much beyond the victim's body, because liquefied body fat acted like a candle wick keeping the flame confined. Plus, the trial court instructed the jury on aiding and abetting, and that it could find true the arson special circumstance if the defendant perpetrated or aided and abetted the perpetrator, and the jury could convict of arson if the defendant set the fire or helped set the fire. Even assuming insufficiency of independent evidence that defendant lit the lighter and held it to the gasoline, his blood on the wall next to the garage door provided ample evidence he aided and abetted arson by fetching the gasoline can.

As to motive, the court instructed the jury the prosecution did not need to prove motive. Even so, there was corroborating evidence of Turner's motive for torture, because (1) the prosecution in this case presented testimony of law enforcement officers who investigated, and a witness who was present at, the 1994 death of defendant's brother "Moose"; (2) some of the stab wounds to the current victim penetrated only skin

11

and soft tissue, supporting an inference of intent to inflict non-lethal pain; and (3) Turner's jailhouse conversation with Trisha Rivera supports an inference that Turner kept the victim alive while shooting, stabbing, and beating him, in order to extract information about the death of defendant's brother. Turner told Rivera: "There's just so much I wanna talk to everyone about and I can't right now, dude. That mother fucker told me everything, dude. That mother fucker told me . . . Dolly [one of the witnesses to Moose's death], Dolly didn't set Moose up, dude. They set Dolly up. [¶] . . . [¶] . . . That dude told me everything, dude. Everything. Yup. I kinda want to apologize to her . . . [f]or the way I treated her, you know? But she didn't have nothing to do with that shit. She really didn't." Independent evidence that supports an inference of guilt can suffice as corroboration of accomplice testimony. (*Avila, supra*, 38 Cal.4th at p. 563.)

Though the evidence presented in this case was that Moose accidentally shot himself and that current victim Jeff Wheatley was not even there, there is no evidence that Turner adopted this view.

The jury instruction on the torture special circumstances required the jury to find that the defendant did an act inflicting the pain. However, the prosecutor did not rely on the act of lighting the fire as the sole basis for torture. The prosecutor argued to the jury: "[W]e know that throughout this entire ordeal, inflicted upon [the victim] at the hands of Robert Turner and his colleagues, [the victim] was alive. . . . Clearly [the victim] was alive when he was lit on fire at the hands of Robert Turner and his colleagues. So we know that certainly [the victim] was alive when this inflicted [sic] the extreme prolonged pain. [¶] . . . [¶] That Robert Turner intended to inflict such pain and killed for the purpose, calculated purpose of revenge, extortion, persuasion . . . or any other sadistic reason. And, of course, you don't stab somebody 32 times without trying to inflict extreme pain, okay. [¶] And while the injuries to [the victim's] head . . . these little inflictions here above his left ear, you can only imagine that, you know, [the victim] is dying. And he's got to know it. I mean, Dr. Omalu testified as much. Yet Robert Turner

12

wants to get information out of him. And you can just imagine Robert Turner taking that knife and just, stay awake buddy, stay awake, we need to get a little bit more information out of you, okay. He's stabbing him to inflict pain, to get . . . information, because he wants to take his revenge on him, because he wrongfully thinks that [the victim] is responsible for his brother. [¶] Now how do we know that? Again, look at his . . . visit with Trisha Rivera." The prosecutor argued the torture was the cause of death, and the shotgun, the stabbing, and the burning all contributed to his death. The prosecutor argued that, even if the jurors found Turner did not "flick the match," he aided and abetted the person who flicked the match. The prosecutor argued, "how can it be any other way [than intent to inflict extreme pain] when you take a knife, after having shot a man twice in the chest and -- or in the shoulder and the face, and then take this knife and plunge it into his body upwards of 32 times? And again, some of those were very shallow. That's somebody just messing with somebody. That's just somebody who is pissed off and I'm gonna . . . mess you up, all right. . . . [¶] [Turner] intended to inflict such pain and suffering on [the victim] for the calculated purpose of revenge."

We conclude there was sufficient independent evidence to convict defendant of arson and to find true the special circumstances of arson and torture.

Under a separate heading, Turner argues the instructional error together with insufficiency of the evidence deprived him of his right to due process under the 14th Amendment to the United States Constitution. Since there was sufficient evidence, we need not address the matter.

*C. Claimed Right to Jury Trial for Restitution Fine*

Turner argues that, because the $10,000 restitution fine imposed under section 1202.4, subdivision (b), is punitive, the Sixth and 14th Amendments entitle him to a jury trial with proof beyond a reasonable doubt.

13

Section 1202.4, subdivision (b), at all pertinent times has provided: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The statute provides a range from a minimum amount that has changed over time to a maximum of $10,000. (§ 1202.4, subd. (b)(1).) At all pertinent times, the statute has provided that, in setting the amount in excess of the minimum, "the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. . . . Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (§ 1202.4, subd. (d); Stats. 2009, ch. 454, § 1; Stats. 2011, ch. 45, § 1, eff. July 1, 2011.)

*Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] (*Apprendi*) held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id*. at p. 490.) The statutory maximum for *Apprendi* purposes is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely v. Washington* (2004) 542 U.S. 296, 303 [159 L.Ed.2d 403] (*Blakely*), some italics omitted.) The statutory maximum is not the maximum the court may impose after finding additional facts, but the maximum the court may impose without any additional findings. (*Id*. at pp. 303-304.)

Turner cites *Southern Union Co. v. United States* (2012) 567 U.S. _ [183 L.Ed.2d 318] (*Southern Union*), which held *Apprendi* applies to the imposition of criminal fines. The statutory fine in *Southern Union* was a daily fine of $50,000 for each day the

14

defendant violated a statute. The trial court there made a specific finding as to the number of days the defendant violated the statute. The United States Supreme Court held this violated *Apprendi*. (*Southern Union, supra*, 567 U.S. at pp. __ [183 L.Ed.2d at pp. 325-329].)

*Southern Union*, *Blakely*, and *Apprendi* do not apply where, as here, the trial court exercises its discretion within a statutory range and does not make any factual findings that increase the potential fine beyond what the jury's verdict allows. (*People v. Kramis* (2012) 209 Cal.App.4th 346, 351-352.)

After completion of briefing in this appeal, the United States Supreme Court held that any fact increasing the mandatory minimum sentence for a crime is an element of the crime, not a sentencing factor, and must be submitted to a jury. (*Alleyne v. United States* (2013) 570 U.S. __ [186 L.Ed.2d 314] (*Alleyne*).) That case does not apply. It involved a statutory crime -- using or carrying a gun during a violent crime -- that carried a five-year mandatory minimum sentence that increased to a seven-year minimum if the gun was "brandished." The jury verdict indicated only that the defendant used or carried a gun. *Alleyne* held the seven-year sentence violated *Apprendi*. However, *Alleyne* specified: "Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment 'within limits fixed by law.' [Citation.] While such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing. [Citation.]" (*Id.* at p. __, fn. 2 [186 L.Ed.2d at p. 328, fn. 2].) *Alleyne* added its ruling "does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. [Citations.]" (*Id*. at p. __ [186 L.Ed.2d at p. 330].)

Turner was not entitled to a jury trial on the section 1202.4 fine.

15

## D. Parole Revocation Fine

Turner argues the trial court erred in imposing and suspending a $10,000 parole revocation fine under section 1202.45, because the court sentenced him to life in prison without possibility of parole. The People concede the point, and we agree.

Section 1202.45, subdivision (a), provides that "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the [section 1202.4] restitution fine . . . assess an additional parole revocation restitution fine in the same amount . . . ."

The parole revocation fine is inappropriate where the defendant's overall sentence does not anticipate a period of parole. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 687.) *Petznick* cited *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, where the sentence included both life without possibility of parole for one murder and 15-years-to-life for another murder. (*Id*. at p. 1184.) *Oganesyan* held the section 1202.45 parole restitution fine was inapplicable because the defendant's sentence "does not presently allow for parole and there is no evidence it ever will." (*Id*. at p. 1185.)

Here, the sentence was life without possibility of parole for murder, plus 25-years-to-life for the firearm enhancement, and the court stayed imposition of sentence on the arson count. The section 1202.45 fine was improper.

### *Summary of Turner's Appeal*

The section 1202.45 fine must be stricken. Turner otherwise fails to show grounds for reversal.

## II

### *Nessler's Appeal*

Nessler's sole contention on appeal is that the trial court violated her state and federal rights by allowing evidence of the circumstances surrounding the note she

16

received while in custody. She claims the case against her was "closely balanced," and the evidence "over-persuaded" the jury that she was in cahoots with Turner.

We reiterate the contents of the note were not read to Nessler's jury.

Nessler objected to use of the note or surrounding circumstances at trial, arguing the evidence was irrelevant and she could not cross-examine Turner about it. The prosecutor argued the circumstances supported an inference that Nessler was cooperating with Turner and did not fear him. After an evidentiary hearing, the trial court ruled the circumstances surrounding discovery of the note were admissible, but the contents of the note were inadmissible against Nessler unless Turner testified.

Nessler testified she never read the note and was not cooperating with Turner in any way. She told Way about Turner threatening her on the bus to court and Way took it upon himself to put money on Turner's books only to get Turner off her back. She continued to receive threats from Turner during transport and from his girlfriend who was also in jail. She reported the threats but was still transported to court on the same bus as Turner.

On appeal, Nessler argues the evidence was irrelevant under Evidence Code sections 350 and 351, because the prosecution failed to establish a "foundational prerequisite" that she knew about the note in advance and intended to respond to it. We review the trial court's evidentiary ruling for abuse of discretion. (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) The trial court did not abuse its discretion. Nessler's response to Turner that she had not yet read "it" supported an inference that Nessler knew the note came from Turner. Turner's unexplained direction that she "read it to him [Way] over the phone" supports an inference that Nessler knew what the note was about. Nothing more was required. The evidence was relevant.

Nessler argues the evidence should have been excluded as more prejudicial than probative under Evidence Code section 352, because the evidence prejudiced her duress defense. We disagree. Prejudice under that statute refers not to damage that flows

17

naturally from adverse evidence, but rather evidence that tends to evoke an emotional bias against the defendant while having very little effect on the issues. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Evidence is more prejudicial than probative under the statute when it poses an intolerable risk to the fairness of the proceedings or the reliability of the outcome. (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) The circumstances surrounding the note neither tended to evoke an emotional bias against Nessler nor posed an intolerable risk to fairness. Her supposition that the jurors may have been inclined to acquit her but for the note is fantasy.

There was no evidentiary error.

Nessler argues the evidence transcended a state law violation and constituted a federal due process violation subject to reversal unless the error was harmless beyond a reasonable doubt. However, there was no state law violation, and application of ordinary rules of evidence such as Evidence Code section 352 generally does not implicate the federal Constitution. (*People v. Abilez* (2007) 41 Cal.4th 472, 503.) Nessler's opinion that the case was close -- because it hinged on credibility and the jury during deliberations reviewed her police interviews -- does not state a constitutional claim.

We conclude Nessler fails to show evidentiary error.

DISPOSITION

In Turner's case, the section 1202.45 fine is stricken, but the judgment is otherwise affirmed.  The trial court shall prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

Nessler's judgment is affirmed.


      HULL          , Acting P. J.


We concur:


     BUTZ        , J.


     HOCH       , J.